Appellate by Julie Galassi versus Roy Sorce, the Appellate Cross Appellant by Stephen Winkman and Sorce Enterprises' eighth Appellate by Christopher Stoker. Okay, Ms. Galassi, I think you're first. Thank you. Good morning. Good morning. May it please the court and counsel, I'd like to first start by discussing the trial court's decision not to impute income. I think there are three key decisions in this case that establishes that the court abused its discretion in not imputing income. The first decision was made by this court when it determined that Roy and Alan Sorce, collectively acting through Sorce Enterprises, intentionally determined to defraud the marital estate during the years 2004 and 2005. This court decided that but for the parties' marital problems, Roy would have been paid significant bonuses for those two years. In making this determination, this court affirmed the trial court's findings that Roy and Alan Sorce's stated reasons for Roy's 80% reduction in income were not credible. One of those reasons consisted of the following. Roy and Alan Sorce told the trial court that the only reason Roy was paid those significant bonuses four years prior to the breakdown of the marriage was to build the marital dream home. And that after the home was finished in 2003, he was going to go back to his $1,600 weekly salary that he'd been earning since 1965. The trial court found that reason not credible, and this court in its decision affirmed that finding. That is the law of the case. The second decision. In September of 2011, Judge Dubicki, in the third party case, found that in 2004 and 2005, Roy would have at least been paid $161,400 in bonus income. At least. But he limited the constructive trust to that amount. Judge Dubicki's finding in 2011 was consistent with his findings in 2009 that for those years, but for the marital difficulties, Roy would have been paid significant bonuses. The third decision as to the imputing income and why it was an abuse of discretion. In April of 2014, the trial court, in announcing the findings in the final dissolution, found that during the course of the marriage, the Sorce family lived an affluent lifestyle. They had a big house, fancy cars, private schools, expensive vacations. They didn't want for anything. The court then at the conclusion of the trial said, Roy continues to basically live that same lifestyle. Roy continues to reside in a $965,000 house, and he has money to spare. The court classified his living as extravagant. The San Franelli and the Tiegler case established that income can be imputed based upon a payor's lifestyle beyond his means or her means. There's the Ellis case that establishes that income can be imputed based upon a family business's failure to pay bonuses after the breakdown of the marriage. Now, all the evidence presented at trial in October of 2013 showed that Roy manipulated his income after 2003 to keep funds from going into the marital pot. And Roy enjoyed a lifestyle that dramatically exceeded his reported income. So we proved both methods that are accepted in order to impute income. Now, during the trial in October of 2013, the only reason given by Roy for the drop in his income after 2003 was that same reason he had given in 2009, which was found not credible. Roy said, well, I didn't get bonuses after 2003 because I was only going to get big bonuses beforehand to build the dream home. That was the only evidence he presented as to why he did not receive bonus income. And that has been flatly rejected as not credible by the trial court. I first heard it, and you affirmed. You know, my view is that Roy lives by the, if you tell a big enough lie long enough, sooner or later, maybe somebody's going to believe it. And you should not, especially when you've already said it's not believable. The trial court didn't find that Roy's income ceased to be diverted after 2003. Instead, the trial court said, I'm not going to impute income because it's too hard to go back and figure out the exact amount that Roy would have earned during those years. Well, since he gave nothing but a fraudulent reason for the reduction in the income, that is wrong. None of the imputing cases require the victim's spouse to establish with some type of mathematical certainty the amount of income that was diverted or went unearned by the support dodging spouse. To require such precision by the victim's spouse simply encourages fraud. One of the cases we cited was clear where the husband was hiding income and he wouldn't give an explanation. And the answer from the court was, well, you can't come in here and complain about the trial court imputing the income that you don't like the amount when you were the one not candid with the court about what you were really earning or you could have earned. Now, you know, Agnes presented expert testimony to look at, you know, well, what would Roy have earned. So we have Neil Gerber, an accountant of 30 years. He had a solid four-year history of the income paid to the stock officers, which was Roy and his family. And Roy's father. So he had a four-year history of how they divided bonus income at the end of the year. And up until that four-year period, up until the marital difficulties started, you know, Roy would get on average 56.8% of the bonus income. You know, during the year the two, Roy and his dad, would take an income and then the big pot would be divided at the end of the year. And again, the history was that Roy always got, you know, a little over 50% of that bonus income. So Mr. Gerber then looked, okay, well, after the breakdown of the marriage, all of the bonus income was paid to Alan. If the parties had been, if those two, Roy and Alan, had been consistent in how they divided income before the breakdown, then taking the income from Roy and his dad, from 2004 up through 2011, after tax, Roy would have been paid a little over $2.1 million in bonus income. And that would have been the 56%. Again, after the breakdown of the marriage, 100% of the bonus income was paid to the father. Now, the court, you know, there's talk of, well, you know, did Roy really get it? It went to his dad. You know, I would first state that the imputing cases don't require us to establish with some certainty that the dollar came out of the till here and it's the same dollar that ended up there. But we did have proof, you know, we did have proof how Roy benefited from the imputing cases. We did have proof how Roy benefited from the money. The 100% of the bonuses, including Roy's, you know, 50%, went to dad. We know then that Roy's brother, James, who had nothing to do with the company, ended up funding Roy to the tune of $583,000 to get back his house and pay off his loans. Where did that come from? Where did this, you know, over half a million dollars come from? Well, it came from a line of credit from Allen Source. So the money from the corporation that would have been Roy's went to Allen. We traced a bunch of that money then, went into a line of credit, and it came right back around to Roy Source. Now, so we, it's our contention he benefited significantly from that money. And that based upon, as I said, he's manipulated the income, there's no proof other than that fraudulent reason that has been discredited to account for the lack of bonus income being paid him. The second thing is that he continues to lead the same lifestyle. How do you live in a million-dollar home when your income drops 80%? Well, how was he paying the property taxes after he got his house back? It was coming from his brother. So he was benefiting significantly from the bonus. Again, he was leading a lifestyle that was far in excess of his reported income of his wages of $1,600 a week and his, you know, rent money from the corporation. And it's for those reasons we believe the court abused its discretion, you know, by refusing to impute income because it couldn't be quantified as to existing income. So the question is, you know, exactly, well, what would they have done it the year? Would it have been a little more? Would it have been a little less than the 56.8% average? Could you explain what the argument is? I don't think it's your argument, but the trial court said something about the fact that there wasn't a legal note and not an expectation that the money would be paid back. Well, and what that stems from is that in the, I'll call it the January of 2005, marital problems had blown up in 04 and the poop hit the fan in January when Roy took, canceled the credit cards, took all the money, took her car, etc. However, that same month, that same month, there was a transfer on the corporate books. Source Enterprises owed Roy in excess of $375,000, which would have been a marital asset. But in January of 05, there was a transfer on the books to Allen Source of that $375,000. Okay, they presented at trial, oh no, no, no, we're not, there was a promissory note Roy signed payable to his dad in 1994 for $200,000. And the 10 years was up, so it was just paid. So, you know, Roy was just paying back a marital debt. Now, you know, the answer to your question is the, you know, the evidence was that, and it was uncontradicted, Agnes back in 94 on, she ran the family finances. Roy didn't have an individual account. Roy said he put it in a joint account. Agnes said there was never any money there. She never saw it in there. Roy never told her that there was a loan from his dad. The corporate accountant and the accountant for Roy and his dad, you know, during those 10 years, it was never put on a financial disclosure. It was never put on a loan application. The accountant didn't know anything about it until, you know, he got a call from Allen saying transfer all the money. Okay. The trial court indicated, and again, the only people who said this was a valid loan was Roy and Allen, who have been found not to be credible before the court. But they did have a 25-year employee of Source Enterprises who came in and said, well, yeah, I saw him sign something. And it was on that basis that she said, well, I don't think it's going to be paid back, but it's a legal note. I am somewhat confused because my first take was that she, the trial court was saying this was a sham transaction and there was no expectation of reimpayment. Because all that has to happen is, you know, after this case is all over, call the accountant and move that 375 back in Roy's car. That's how I took it. But I think it's subject to interpretation the way she, her wording in the decision. You know, the other point about the note is that if it was really a $200,000 debt, when they transferred it, they overpaid it, you know, by almost $40,000. You know, they couldn't compute the interest correctly. The trial court didn't address that. You know, well, even if it was valid, well, there's still, you know, $30,000 plus that Roy transferred to his dad that would be a marital asset. The trial court did not address that. But it, you know, as I said, I think it was a sham that it's going to be really paid back dollar for dollar since it was just a transfer on the corporate books, which, as I said, after this is all over, it can be easily transferred back. The fee issue, you know, it's our contention that, you know, the court should have awarded more fees by Roy to Agnes, you know, because it's an abuse of discretion not to award fees when there's a disparity of income and earning potential. Roy's earning potential is undisputedly, you know, in excess of $500,000. Up to $700,000 in the four years before the breakdown of the marriage. I'm sorry, per year. You know, even at the time of trial, his reported income of $10,000 is 10 times more Agnes of $1,000 a month. You know, the other point, and the trial court passed on all of the fees incurred in the third party proceeding. And, you know, thank you, thank you. That, you know, the law allows if you do something illegal or commit fraud in the course of a dissolution action, then you're liable for that. And it was not appropriate for Aggie to have to fund to recover monies fraudulently taken, which then he shares half, but she gets to pick up the tab to get the money. Thank you. Mr. Wakeman, good morning. Good morning. My name is Steve Wakeman, I represent Roy's source in this matter. This is a case that was tried, a divorce case before a very good trial judge, Kate Gorman. There were a couple of issues that we take issue with that we think were errors. If I may, time permitting, I'm going to talk about three or four different things here. Let's start with the imputation of income argument that Ms. Galassi has made on behalf of Agnes. This is the third time that some of these parties, Agnes and Source Enterprises, have been before this court. It is the first time that I, on behalf, or Roy, have been before this court. I'm not going to go through the whole history of this case through the appellate process, other than to make a couple points. The first appeal in this case, the appellate court held that the trial judge erred in failing to impose a constructive trust relative to bonus income that was not paid to Roy's source by Source Enterprises that was held in some certificates of deposit by Source Enterprises. The cause was remanded back to the trial court. The trial judge then awarded $161,400 in imputed income that would have been paid to Roy's source for bonuses that were not paid to Roy during the years 2000 and 2001. The trial judge then awarded $161,400 in imputed income that would have been paid to Roy's source for bonuses that were not paid to Roy during the years 2004 and 2005, and imposed the constructive trust directed by this court. Judge Dubicki, the trial judge, stated that under no circumstances would he have awarded more to Agnes Source than the $161,400. The case came back to this court. It was affirmed. The case then goes back to trial before Judge Gorman, and at trial in the divorce court, Agnes again asked the court to impute over $2.1 million of income, bonuses, she claimed, that were not paid to Roy by Source Enterprises during the years 2004 through 2013. The trial judge properly declined to do this. Now, Agnes called an expert, an accountant, Neil Gerber, who testified that if Source Enterprises had paid out bonuses as it did during a four-year period from 1999 through 2003, the period that the Source Dream House was being built, if Source Enterprises had done that in the same way it did during the four-year period, the bonuses would have been paid to Roy. If Source Enterprises had paid out bonuses as it did in those four years, then Roy would have received over $2.1 million over a nine-year period from 2004 through 2013. Judge Gorman found that Mr. Gerber's testimony regarding this imputation of income was speculative. She found that it is simply not possible to determine what bonuses, if any, were paid to Roy by Source Enterprises. She also found that Roy Source might have received after 2005. Indeed, the last bonus that he received from the company was in 2003, some 21 months before any petition for dissolution of marriage was even filed. He received no bonuses in 2004, 2005, or 2006 through 2014. He has not received any bonus income for imputation purposes. Now, in 2004 and in 2005, Judge Dubicki, upon the remand from this Court, did find imputed income for those years of $161,400 from Source Enterprises. Those years were already decided by the trial judge. The imputation of income for 2004 and 2005 were done. Judge Dubicki ruled that he did not allow Agnes to amend her third-party complaint against Source Enterprises to seek additional imputed income for years after 2005. Again, Agnes appealed. This Court affirmed that decision. So, she tried again to impute income to Roy that he has never received at the trial of this cause and the divorce. The trial judge properly rejected that argument. Indeed, Roy Source, after April of 2007, was no longer a shareholder in Source Enterprises, no longer an officer or director of the company. For the last 11 years, Roy Source's income from Source Enterprises has been the same. He has received the same salary in that time with no bonuses since 2003. No bonuses in over 11 years. The petition for dissolution of marriage was filed in 2005. Again, the last bonus was in 2003. Judge Gorman's findings in this regard and her rejection of the imputation of income argument was amply supported by the evidence in this case. There was no abuse of discretion on her part. And while counsel has cited other cases, San Fratello and Tegeler, in which the Court found a proper basis to impute income, there is no case that has been cited that would authorize an imputation of income in the manner in which it was found. This is a manner that has been suggested by Agnes in this case going back over a period of 9 to 11 years. The second area that I want to talk about is the maintenance that was ordered by the Court, which we believe was excessive. Judge Gorman found that Roy Source's gross income is $10,000 a month and his net income is $8,000 a month. She ordered $3,200 a month in maintenance, which is 40% of that net, on top of 28% for child support for two children, which is another $2,217. She also required Roy to pay for Agnes' COBRA health insurance coverage and all of the uncovered medical expenses on the children. The result is that he spends approximately $5,500 to $5,600 per month of an $8,000 net, or roughly 70% of his net on those Court-imposed obligations. After making those payments, his spendable income is approximately $2,400 to $2,500 a month for him to live on, with a rent payment of $1,550. Agnes' net income, taking the $5,400 that she receives from Roy, in addition to her $6,000 a month, puts her a little over $6,000 a month in net income. So her income is roughly 2.5 times Roy's in terms of net. We believe that disparity is excessive and that the maintenance awarded here is an abuse of discretion and should be in the line of $1,500 a month. How much did you say her net was? A little over $6,000. My calculation is about $6,036, if I recall that correctly.  His net before he pays maintenance and child support is $8,000. So after paying maintenance and child support, he is left with roughly $2,400 to $2,500. As to the attorney's fees, we believe each party should be responsible for paying their own. In this case, Judge Gorman ordered Roy to pay an additional $15,000 of Agnes' attorney's fees. The reason we believe this was an abuse of discretion is because under the law as announced in this court, to have a fee shifting of attorney's fees, one must show his or her inability to pay his or her own attorney's fees and the corresponding ability of the other party to do so. In this case, Agnes' financial situation is better than Roy's. Not only in terms of net income on a monthly basis, but she has as much in an equal division of the assets as does Roy. And that's the last point I want to address, the equal division of marital assets. We believe the court, certainly in its discretion, it was proper to do that. But the court neglected to look at two factors in that equal division. And those are the attorney's fees that were paid out on behalf of the parties as advancements from the marital estate need to be taken into consideration. In this case, $57,000 plus additional fees that have come out of marital assets that were once in my trust account have been paid out on behalf of Agnes' attorney's fees over those that have been paid out towards Roy's. Secondly, the court failed to consider the dissipation, which was found in this case by Agnes. Now, I don't have time to talk about all the dissipation issues that are addressed in the briefs, but Agnes has admitted in her brief that she dissipated over $29,000 of assets. We think it's more like $150,000, but it is admitted that she dissipated $29,000. The court specifically found in each claim dissipation of Roy that there was no dissipation, that Agnes failed to meet her burden of proof. And if I may come back to Justice McDade's question of Ms. Velassi, the court's comment about this being a legal note, that was one of the claims of dissipation. I believe that what Judge Gorman was saying is when she says this is a legal note and the money is not going to be paid back, she meant that Roy's source is not getting any money back. She found the witnesses credible, Ed Matthews and Jim Chatwell, the accountants who testified to this. She found there was no dissipation. She found Agnes failed to meet her burden of proof. And when she said it doesn't have to be paid back, I think what she meant to say was it has been paid and it's not coming back from Alan's source to Roy's source. And that's how that comment, I think, made sense. You read the whole transcript, and I think that it's addressed in the briefs. I think that is the gist of what she was saying. So we are asking that the specific points relating to the payment of attorney's fees, the equal distribution of marital assets without the consideration for the factors of Agnes' dissipation and the advancements from the marital estate be reassessed on remand, that this court reverse on those points as well as the amount of maintenance and in all other respects we believe the trial court's decision should be affirmed. Thank you. Any other questions? Thank you, Your Honor. Good morning. Good morning. May it please the court, counsel, my name is Christopher Soken, I represent Source Enterprises. The sole issue with regard to Source Enterprises is whether or not the trial court would use their discretion in denying Agnes' fees from Source Enterprises. Given my limited time that I have to share with Mr. Wakeman, I'd like to skip to what I think is the more entertaining issue for the court, which is whether or not the Dissolution Act allows a corporate entity to have to pay attorney's fees in a third party proceeding. The way that this case has proceeded was Source Enterprises was brought in as a third party, as the court knows, and whether or not they had to pay additional funds into the marital estate. That decision was decided with finality on September 8, 2011 and there was a 304A finding entered. No petition for attorney's fees was filed. A notice of appeal was filed, the case came up to this court on appeal, with no issue before it about attorney's fees. It wasn't until roughly a year later in which Agnes filed a petition for attorney's fees that was while the case was still at this court and at which point it was affirmed. It was affirmed without remand. At that point, the case was simply over. Now in the trial court, the petition for fees was still pending. But at that time, the court was without any jurisdiction to hear that petition for attorney's fees because 30 days had elapsed from the time of the September 2011 order that ended the case. We cited the Hurley v. Decision in our brief, which had held that the court retains its jurisdiction for 30 days after final order to entertain an issue of attorney's fees regardless of if the notice of appeal was filed. I think the reason is why they still do that regardless of the notice of appeal is so we don't have what we have in this case, which is piecemeal appeals. We had an appeal of that final order, but now we're back again on an appeal of attorney's fees that could have been decided and should have been decided in that original decision. So what Agnes had done was waited until a year after that decision to file her petition for attorney's fees and at that point the trial court had no jurisdiction over Source Enterprises, Inc. I do have to say that the trial court, when it denied attorney's fees to Agnes from Source Enterprises, did not enter any specific reason why. So we are in a situation where you may affirm on any basis in the record. The lack of jurisdiction is one of the reasons the court could have done so. We would ask they affirm on that ground. But as I stated before about the more entertaining issue is the Dissolution Act. Counsel for Agnes has suggested that because this was quote, ancillary litigation under the Dissolution Act, then attorney's fees can be awarded per the Dissolution Act. The cases that Agnes has cited in her brief are all discussing prevailing party attorney's fees or contract attorney's fees, not the attorney's fees that are at issue under the Dissolution Act, which the court knows are based on balancing between the two spouses. Looking at the Dissolution Act, I would submit that when they changed the phrase spouse to party, as they did, that is now an ambiguous term because the court needs to trace how the attorney's fees that Agnes is requesting to the factors that are set forth in the statute. What the statute says is as you trace it and move from 508 to 503J and then back to 504, what the statute says is you need to look at the property division factors and the maintenance provisions. And not to sound cute, but Source Enterprises and Agnes were never married. They were not married. They were not divorced. If we look through those factors, we're not going to find what split of their assets were. We're not going to find how much of Source Enterprises' income. None of those factors are applicable. So the court could have looked at those factors and said well, none of these apply, so the answer is zero. She gets no attorney's fees. I believe the issue when the legislature changed from spouse to party was to address other issues, and I've cited some of the legislative history in the case because I do believe that party is ambiguous in this sense, and the legislative history suggests that the sole reason for changing that had to do with issues involving either visitation or other issues unrelated to the dissolution that still would arise under the Act. This case does not arise under the Act. It's merely a third party case that has nothing to do with the Dissolution Act. So when the statute uses the term spouse or they use the term marriage, they use those liberally. They don't say third party. They don't say corporation. There's nothing in the legislative history that would suggest that the court intended that you could bring in an outside entity and say well, you need to pay my attorney's fees when the provision is solely to provide a balancing between the two spouses. Source Enterprises paying attorney's fees to Agnes doesn't balance the spouses. It gives money directly to Agnes. It has nothing to do with balancing. It has nothing to do with the property divisions under the Act. I cited the Pell v. Gudgell decision, which addressed a similar issue, which was an intervener entered into a case under the Dissolution Act and said hey, I want them to pay my fees. And the court in that case said no for the same reasons that I am presenting to you now. It says spouse. It says marriage. It doesn't say the other party can pay. It only says that when it defines the parties to the dissolution. It says party, but when you go further into the statute, at least those attorney fee provisions, it drops that language and moves to spouse and marriage. In the Gudgell decision they said no, an intervener is not a spouse, is not a married party, has nothing to do with the dissolution. You cannot get fees under the way that the legislature set up the dissolution proceedings. Thank you. Thank you. Ms. Glass, you have a rebuttal. Thank you, Your Honor. I'd first like to address Mr. Wakeman's argument that because in the third party case Judge Dubicki would not allow amendment of third party complaint to add subsequent years after 2005 that somehow I was barred in the divorce case from pursuing imputation. First off, that's a res judicata argument, which doesn't work. I'd never filed a separate suit. This was a claim. It was all one case. And so res judicata doesn't apply. Even if, and I'm going to jump, even if you thought, well, maybe that sounds like res judicata to me, the bottom line is it still doesn't apply because the trial court specifically reserved the imputation claims, and I've set forth the quote in our brief, in our response brief, that the court specifically reserved Agnes' claim of imputation that said we're going to deal with that in the divorce case. First we're going to deal with the constructive trust case. And even if you don't like that, the bottom line is Roy acquiesced to hearing the imputation for all of those years in the divorce case. Quoted counsel's statements at the third party trial as well as there was never any objection made that no, it has to be heard in the third party case, which is a requirement. If you don't object to having issues overlap from one proceeding into another, you have to object and you never did. With regard to source enterprises, you know, I don't think I know what a spouse is, and if you change the word spouse to party, you know, I don't think party is an ambiguous term. I mean, I think we learned what a party was, you know, the first year of law school. It's somebody in a lawsuit. The Illinois Marriage and Dissolution of Marriage Act specifically allows for third party actions in order to bring in third parties, you know, for a variety of reasons. And here it was because we said this third party holds marital funds. So there's no ambiguity. The second thing is that, you know, under the Illinois Marriage and Dissolution of Marriage Act, you know, a 508 petition for final fees can be filed at any time before a final judgment of dissolution of the marriage or 30 days thereafter. There is only one case, or never two separate suits, and so we filed our fee petition against source, you know, before the entry of the final judgment of dissolution. The other point that counsel made is that, well, you know, if you jump between the provisions that 503 says, well, you've got to look at these factors and it all deals with, they sure didn't mean some third party inherits the disparity of income. They didn't mean that because a lot of these just talk about spouses. What he doesn't mention is that the factors besides disparity of income between the parties that the court can look at all relevant factors. Well, if you look at the relevant factors between Agnes and source, it's disparity of income. What is not relevant is that Agnes was a homemaker to Source Corporation. It was that between these two parties it was a disparity of income. And to hold otherwise is, you know, in how many divorce cases do you have somebody in the background pulling the strings for one spouse or the other, whether it's hiding money, hiding assets. And if you close the door to being able to go after those third parties who basically manipulate the system to hide assets, then they're never liable. And people need to learn that if you're going to involve yourself in a divorce and manipulate income or hide assets and you get brought into a case and you're found to have hidden assets or diverted income, then you are going to pay for your behavior. It is unconscionable that, you know, these acts could be taken, found to have been fraudulent and affirmed and Agnes has to pick up the tab for the whole thing. Thank you. Thank you. We thank you for your arguments this morning. Excuse me, Your Honor. We thank you for your arguments this morning. Do I get on my cross appeals? I'm sorry. Okay. It's not on my paper so I've forgotten. Thank you. Just a couple of points. I don't think I'll use all of that time. Ms. Galassi has now had several bites of the apple with regard to her imputation of income claim. We have briefed the issues of res judicata, law of the case, collateral estoppel, which we think is a bar to her re-litigating this issue again. But the trial court basically heard the arguments again and said regardless of whether Judge Dubicki decided this or not, this testimony is speculative and you simply can't tell what kind of bonuses Royce Sorce might have received over this nine year period. And for 2004 and 2005, Judge Dubicki has already decided. With regard to that, there's one expert witness, Neal Gerber, modified his opinions at trial to reflect the fact that for the years 2004 and 2005, those imputation of income issues were in fact decided by the trial court Judge Dubicki in the earlier appeal. And so what he said is of this $2.1 million that I was going to impute, you really have to deduct something from that for 2004 and 2005 because that's already been decided. Coming to this comment by Ms. Galassi about there being a disparity of income, that simply is not the case. There may have been at one point in time, but there's not now. If there is a disparity of income, it has swung the other way to the fact that Royce Sorce has about, Agnes Sorce has about two and a half times greater income, spendable income, than does Royce with the payment of maintenance and child support. In fact, on that point, paragraph 15 of the judgment of dissolution of marriage, which can be found at A21 in the appendix, Judge Gorman specifically found that Roy has seen a significant reduction in his income since the marital relationship deteriorated. And that is the case. There is not a disparity that Roy has a much greater income or earning capacity than Agnes at this point. That has been accounted for through maintenance and child support. And lastly, Ms. Galassi keeps saying that there has been a manipulation of income or hiding of assets to suggest that Roy has done these things in this case, and that is simply not borne out by the facts of the case. The fraud that was found in this case was relative to actions by Sorce Enterprises. The only actions by Roy, according to this court, was his complicity by his acquiescence in the fact that his salary had been reduced during that time. There is a specific provision in this court's ruling, which can be found at A131 of the appendix, that found that Roy did not enter into any agreement with Alan Sorce to divert his salary or bonuses or to keep it out of the marital estate. That was a finding in the first appellate decision. The idea here or the suggestion that we should impute income because Roy has been guilty of manipulating his income or hiding assets simply is not the case. There has been no evidence in this case that he did any of those things. As a result, again, we would ask that this court affirm on all issues except for the issues in terms of the amount of maintenance which we believe is excessive, that the court's equal division of marital assets is appropriate but needs to be adjusted to consider under Section 501C-12 the advances from the marital estate on Agnes' behalf for her attorney's fees, which grossly exceed those from the marital estate on Roy's behalf to the tune of over $57,000 and to consider her admitted dissipation, which is at least $29,000, which should be awarded to Roy to equalize the marital assets and then an equal division. When that happens, quite honestly, there is nothing left. Roy is still in the hole if that is the case. And then finally, the last point is that we believe the award of attorney's fees of $15,000 is also excessive. Agnes has as much or better financial ability to pay her own attorney's fees as does her ex-husband. Thank you. Now we thank you for your argument. We will take the matter under advisement and will issue a written decision as quickly as possible.